## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| DONNIE EUGENE AIKINS, ET AL. | § | |
| *Plaintiffs* | § | |
| vs. | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| WARRIOR ENERGY SERVICES CORP. | § | JURY DEMANDED |
| *Defendant* | § | |

## PLAINTIFFS' RESPONSE TO DEFENDANT WARRIOR ENERGY SERVICES CORPORATION'S MOTION FOR SUMMARY JUDGMENT

### I.  INTRODUCTION

The undisputed factual record establishes that Plaintiffs including Bellwether Plaintiffs Michael Alvarado, Matthew Scott Barrows, Cody Holland and Randall Newell ("Plaintiffs", "Alvarado", "Barrows", "Holland" or "Newell") fall outside of the scope of the narrowly-construed Motor Carrier Act ("MCA") exemption to the Fair Labor Standards Act's  ("FLSA") overtime pay mandate under the SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244. ("TCA"). Because Plaintiffs worked on both vehicles with gross vehicle weight ratings of 10,000 pounds or less and over 10,000 pounds they are "covered employees" under the TCA's exception to the MCA and are entitled to overtime protection pursuant to the FLSA. As result, they are, as a matter of law, entitled to their overtime wages for hours worked over forty (40) in a single workweek during

1

all such workweeks while employed by Warrior Energy Services Corporation. ("Defendant"). Based on the TCA and the overwhelming evidence submitted supporting their positions, Plaintiffs are "covered employees" entitled to overtime wages under federal law *notwithstanding* the MCA exemption. In these connections, Defendant Warrior Energy Services Corporation's Motion for Summary Judgment should be denied as a matter of law in its entirety as to all Plaintiffs. (Doc. No. 51).

## II.    MATERIAL FACTS

Defendant is in the well service business. (Exhibit A, Declaration of Alvarado, Exhibit B, Declaration of Barrows, Exhibit C, Declaration of Holland, Exhibit D, Declaration of Newell).

Plaintiffs were employed by Defendant primarily as well service workers during all times relevant to this lawsuit. (Exhibits A, B, C, D; Exhibits 1-59, Declarations of Non-Bellwether Plaintiffs). Plaintiffs' primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit. *Id.*

Throughout Plaintiffs' entire employment with Defendant and as part of Plaintiffs' required job duties, Plaintiffs worked with, worked on, drove, loaded or performed mechanic and maintenance duties on pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in

2

conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on the public highways for Defendant's business-related purposes including servicing wells in North Dakota, Montana or other states without any trailer attached to or towed by the Ford F-250. (Exhibits A, B, C, D; Exhibits 1-59). The pickup trucks, mainly the Ford F-250s that Plaintiffs worked with, worked on, drove, loaded or performed mechanic and maintenance duties on in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. *Id.* The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. *Id.*

Plaintiffs worked with, worked on, drove or loaded the above described pickup trucks during every week of Plaintiffs' scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of Plaintiffs' required job duties. (Exhibits A, B, C, D; Exhibits 1-59). During the relevant time period, Plaintiffs drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much *or more* than they drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. *Id.* Alvarado asserts that he drove the Ford F-250 every day. (Exhibit A). Barrows asserts that he drove the Ford F-250 1-2 times per day. (Exhibit B). Holland testifies that he drove the Ford F-250 5-7 times per week.

3

(Exhibit C). And Newell declares that he drove the Ford F-250 3-5 times per week. (Exhibit D). Plaintiffs drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part of Plaintiffs' required job duties whether servicing wells in North Dakota, Montana or other states. (Exhibits A, B, C, D; Exhibits 1-59). It was common practice for Plaintiffs and all the crew members to drive the Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota, Montana or other states performing such tasks as transporting Defendant's property, well servicing equipment and fuel in the slip tanks that were contained in the bed of the Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. *Id.* The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. (Exhibits A, B, C, D). Additionally, Plaintiffs very rarely, if ever, pulled or towed a trailer or fuel trailer behind the Ford F-250 on the public highways when retrieving and loading fuel during well service jobs. (Exhibits A, B, C, D; Exhibits 1-59). Any trailer, including a fuel trailer if necessary, was usually towed on the public highways by the supervisor at the beginning and ending of a well service job and generally

4

remained on location during the well service job until the job was completed. *Id.* When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the slip tanks transported and contained in the bed of the Ford F-250. *Id.* Plaintiffs would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. *Id.* In the remote locations that Plaintiffs worked servicing wells in North Dakota and Montana, fuel runs by Plaintiffs in the Ford F-250 from the well site to a fueling station could be substantial distances from 12 miles to 30 miles away to up to approximately 40-50 miles away from the well site. (Exhibits A, B and C). There was a constant and continuing need and a part of Plaintiffs' job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. (Exhibits A, B, C, D; Exhibits 1-59). During well service jobs whether in North Dakota, Montana or other states, Plaintiffs would routinely drive the pickups or the Ford F-250 to a fueling station. *Id.* Plaintiffs would then load the fuel in the slip tanks. *Id.* While loading the fuel in the slip tanks, Plaintiffs had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford

F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. *Id.* Furthermore, Plaintiffs would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, fluids, oils and lubricants used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. *Id.* The fuel, supplies and equipment Plaintiffs loaded and transported moved in interstate commerce. *Id.* All of the loading described above was a continuing part of Plaintiffs' job duties. *Id.* Plaintiffs assert that the loading, transporting of fuel, equipment and supplies and fueling of the slip tanks in the pickups was *meaningful work* because it kept the equipment and machines operating during well service jobs. *Id.* Because, once Plaintiffs and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed whether the well service job lasted 2 days, 7 days or more than a week, if necessary. *Id.* The Ford F-250s Plaintiffs transported as part of the equipment needed for their job and duties and used by Plaintiffs and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. *Id.* A well service job could not be successfully and effectively completed or performed without transporting and

6

using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. *Id.* If the Ford F-250 specially equipped with the slip tank was not driven to the well site by Plaintiffs and the other crew members daily, the well service job could not be done. *Id.* The Ford F-250 was used as Plaintiffs' mobile storage unit for their water, bags, supplies, tools and equipment needed on location at a well service job. *Id.* Plaintiffs assert that The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer replenished and equipment operating during a well service job. *Id.* The Ford F-250 was used by Plaintiffs numerous times per day to retrieve and load fuel for the well site. *Id.* The Ford F-250 was not solely used for transporting the crew. *Id.* Additionally, prior to beginning and after well service jobs for any particular day, Plaintiffs also routinely drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by Plaintiffs' supervisors after meeting at a designated location at the well site as required by Plaintiffs' supervisors, a designated location such as the hotel or "man camp" parking area as required by Plaintiffs' supervisors or Defendant's shop or "yard". *Id.* Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the Ford F-250 were mandatory requirements as directed by Plaintiffs' supervisors or Defendant. *Id.*

7

When directed by their supervisors to drive the Ford F-250 and the crew from the well site, Plaintiffs were not relieved of their work/driving duties until the crew returned to the man camp or hotel. *Id.* Driving to and from the man camps and hotels was generally shared between each member of the crew and the supervisor. (Exhibits A and B). The average drive time from the man camps/hotel to the well site was approximately 1 ½ to 2 hours. (Exhibits B and D). Plaintiffs would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site for the particular day as required and directed by Plaintiffs' supervisors. (Exhibits A, B, C, D; Exhibits 1-59). While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, Plaintiffs and the other members of the crew are receiving instructions from the supervisor related to the well service job and, Plaintiffs routinely performed a job safety analysis (JSA) during this time driving to the well site. *Id.* Plaintiffs assert that they routinely on a weekly basis, and as part of their continuing job duties throughout their employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota, Montana or other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. (Exhibits A, B, C, D;

8

Exhibits 1-59). Also as a continuing part of Plaintiffs' job duties, Plaintiffs would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without any trailer attached from business establishments engaged in interstate commerce. *Id.* Notwithstanding, as part of Plaintiffs' job duties during the relevant time period, Plaintiffs had a reasonable expectation that they would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. *Id.* In addition, Plaintiffs were in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of Plaintiffs' job duties. *Id.* Plaintiffs assert that they could be terminated if they refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to well site locations. *Id.* The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer. *Id.*

Furthermore, as part of Plaintiffs' continuing duties, Plaintiffs routinely performed, or assisted other employees in performing, as part of Plaintiffs'

9

continuing job duties, mechanic, maintenance, inspection, adjustment and repair duties on Defendant's Ford F-250s and other vehicles with gross vehicle weight ratings of 10,000 pounds or less that were regularly used and engaged in interstate commerce on the public highways during the relevant time period including but not limited to motor fluids, power steering and brake fluids, lights, headlights, tail lights, windshield wipers and inspecting air pressure in tires. (Exhibits A and C).

During Plaintiffs' scheduled shifts throughout Plaintiffs' employment with Defendant, Plaintiffs routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. (Exhibits A, B, C, D; Exhibits 1-59). Defendant did not pay Plaintiffs any overtime wages for the hours Plaintiffs worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit. *Id.*

The Defendant did not keep or require Plaintiffs to keep specific records related to the work Plaintiffs performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. *Id.* Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance Plaintiffs performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during Plaintiffs' employment relevant to this lawsuit. *Id.* Defendant is a federal motor carrier. *Id.* Defendant's United States Department of Transportation Number is

10

442564. *Id.* Finally, DJ Justus, the alleged Vice President of Coil Tubing for Warrior, did not work on any well service jobs with Plaintiffs nor did he witness any of Plaintiffs' or their supervisors' work activities involving the Ford F-250 while on a well service job. (Exhibits A, B, C, D).

### III.   ARGUMENT

A.   The Applicable Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc); *see also Baton Rouge Oil and Chem. Workers Union v. ExxonMobil Corp.,* 289 F.3d 373, 375 (5th Cir. 2002). It is a "fundamental principal" of summary judgment that a court must not credit the movants' evidence over that of the non-movant at this stage of proceedings, and to ask that a court do otherwise, without more, would demonstrate "a clear misapprehension of summary judgment standards." *See Tolan v. Cotton*, No. 13-551, 572 U.S. ___, 2014 WL 1757856, at *6-7 (2014) (per curiam). At the summary judgment phase, the court must view the evidence in the light most favorable to the opposing party and does not make credibility determinations or weigh conflicting evidence. *Id.*

The Defendant has the burden of proof regarding its assertion of the Motor Carrier Act exemption to justify its failure to pay overtime to Plaintiffs. S*onger v. Dillon Res., Inc.*, 618 F.3d 467, 471 (5th Cir. 2010). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008).

B.    The MCA Exemption – Like All FLSA Exemptions – Must Be Narrowly Construed Against the Employer

Section 7 of the FLSA entitles employees to overtime premium pay equaling one and one-half times their regular pay rate for hours worked over 40 per week. *See* 29 U.S.C. § 207(a)(1).  In *Parker v. NutriSystem, Inc.*, 620 F.3d 274 (3d Cir. 2010), the Third Circuit described the public policy underlying the overtime pay mandate:

> Congress enacted the FLSA "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general well-being of workers.'"  *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981) (*quoting* 29 U.S.C. § 202(a)).  The Act was designed "to ensure that each employee covered by the Act would receive '[a] fair day's pay for a fair day's work' and would be protected from 'the evil of overwork as well as underpay.'"  *Id.* (*quoting* 81 Cong. Rec. 4983 (1937) (message of President Roosevelt)).

The legislative history of the overtime compensation provisions of the

> FLSA reveal a threefold purpose underlying them: (1) to prevent workers who, perhaps out of desperation, are willing to work abnormally long hours from taking jobs away from workers who prefer shorter hours, including union members; (2) to spread available work among a larger number of workers and thereby reduce unemployment; and (3) to compensate overtime workers for the increased risk of workplace accidents they might face from exhaustion or overexertion. *Mechmet* [*v. Four Seasons Hotels, Ltd.*], 825 F.2d at 1175-76 (7th Cir. 1987) (citing H.R. Rep. No. 1452, 75th Cong., 1st Sess. (1937); S. Rep. No. 884, 75th Cong., 1st Sess. (1937)).

*Id.* at 279; *see also A.H. Phillips v. Walling*, 324 U.S. 490, 493, 65 S. Ct. 807; 89 L. Ed. 1095 (1945); *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981). The Supreme Court has held that this "broad remedial goal of the [FLSA] should be enforced to the full extent of its terms." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 173, 110 S. Ct. 482; 107 L. Ed. 2d 480 (1989).

An employer bears a substantial burden to show that its employees fall within the § 13(b)(1) exemption and thus stand outside the FLSA's overtime provisions. *Songer*, 618 F.3d at 471; *Gonzalez v. Smith International, Inc.*, 2010 WL 8971797, at * 10 (S.D. Tex. Jan. 29, 2010). The employer must prove that the employee falls "plainly and unmistakably" within the terms of the exemption. *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945); *Owens v. CEVA Logistics/TNT*, 2012 WL 6691115, at * 5 (S.D. Tex. Dec. 21, 2012). Moreover, because of the FLSA's remedial goals, its exemptions—including the Motor Carrier Act exemption—must be read narrowly. *Gonzalez*, 2010 WL 8971797, at * 10.

13

The primary issue in this case is whether Plaintiffs, including Bellwether Plaintiffs Alvarado, Barrows, Holland and Newell are exempt from the overtime requirements of the FLSA under the Motor Carrier Act exemption or whether they are nonetheless subject to the FLSA's overtime requirements under the TCA as "covered employees". It is absolutely indisputable that Plaintiffs worked "in whole or **in part**" with vehicles with gross vehicle weight ratings of less than 10,000 pounds during and as a regular part their employment with Defendant entitling them to overtime wages as shown above and further explained below.

C.     The MCA Exemption and Recent Legislative Changes

The MCA Exemption excludes from the FLSA's overtime pay mandate "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49."   29 U.S.C. § 213(b)(1).   Specifically, Congress provided for the Secretary of Transportation (or "DOT") to "prescribe requirements for qualifications and maximum hours of service of employees of, and safety of operation and equipment of, a motor carrier," 49 U.S.C. § 31502(b), if it provides interstate transportation of property or passengers, *Id.* at § 13501(1).

1.     The 2005 Change in the Definition of "Motor Carrier"

Prior to August 2005, a "motor carrier" was defined as a "person providing motor vehicle transportation for compensation."   49 U.S.C. § 13102(12) (2000).

However, on August 10, 2005, the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-59, § 4142(a), 119 Stat. 114, 1747 ("SAFETEA-LU") was enacted.

As part of this legislation, SAFETEA-LU changed the definition of a "motor carrier" in the MCA to "a person providing *commercial* motor vehicle (as defined in [49 U.S.C. §] 31132) transportation."  49 U.S.C. § 13102(14) (2005) (emphasis added).  The term "commercial motor vehicle" was defined as:

> a self -propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle -- (A) ***has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds***, whichever is greater; (B) is designed or used to transport more than 8 passengers (including the driver) for compensation; (C) is designed or used to transport more than 15 passengers, including the driver, and is not used to transport passengers for compensation; ***or*** (D) is used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of this title and transported in a quantity requiring placarding under regulations prescribed by the Secretary under 5103.

49 U.S.C. § 31132(1) (emphasis added).  By replacing the term "motor vehicle" with "commercial motor vehicle":

> Those who did not use commercial motor vehicles were no longer considered motor carriers.  Consequently, for those persons or entities who did not operate commercial motor vehicles, the Motor Carrier Act exemption would not apply because the Secretary of Transportation no longer had regulatory authority. These carriers were now within the Department of Labor's jurisdiction and employers could be required to provide overtime compensation.

*Mayan v. Rydbom Express, Inc.*, 07-cv-2658, 2009 U.S. Dist. LEXIS 90525, *12-

15

13 (E.D. Pa. Sept. 30, 2009); *see also Bedoya v. Aventura Limousine & Transp. Serv.*, 11-cv-24432, 2012 U.S. Dist. LEXIS 128826, *7-8 (S.D. Fla. Sept. 11, 2012) ("Thus, beginning in 2005, a motor carrier was exempt from having to pay its employees overtime ***only if*** the vehicles the motor carrier owned: '(1) traveled . . . in interstate commerce; and (2) weighed over 10,001 pounds [or] were designed to transport more than 8 passengers including the driver . . . .' This represented a fairly significant change, as 'employees of motor carriers . . . historically ha[d] not been entitled to overtime compensation.'") (internal citations omitted).

  2.   The MCA After the SAFETEA-LU Technical Corrections Act of 2008

On June 6, 2008, Congress enacted the SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244, 122 Stat. 1572, 1620. For purposes of this lawsuit, the TCA made two notable alterations to SAFETEA-LU.

First, Section 305(c) of the TCA (entitled "Definitions Relating to Motor Carriers"), eliminated the SAFETEA-LU's definition of "commercial motor carrier" and reinserted the prior definition of "motor carrier." *Id.* This change "expanded the scope of the [DOT]'s authority to entities that operated ***any kind of vehicle***, *see* 49 U.S.C. § 13102(16), not merely entities that operated commercial motor vehicles." *Allen v. Coil Tubing Servs., L.L.C.*, 846 F. Supp. 2d 678, 704 (S.D. Tex. 2012) (emphasis added).

Second, Section 306 of the TCA (entitled "Applicability of the Fair Labor

Standards Act Requirement and Limitation on Liability") addressed the scope of the MCA Exemption to the FLSA's overtime premium mandate. *Id.* Section 306(a) provides that: "Beginning on the date of enactment of this Act, section 7 of the Fair Labor Standards Act of 1938 (29 U.S.C. 207) shall apply to a ***covered employee*** notwithstanding [the MCA Exemption]." *Id.* (emphasis added).   Section 306(c) defines a "covered employee" as follows:

> COVERED EMPLOYEE DEFINED. – In this section, the term "***covered employee***" means an individual –
>
> (1) who is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);
>
> (2) whose work, ***in whole or in part***, is defined –
>
>> (A) as that of a driver, driver's helper, loader, or mechanic; and
>>
>> (B) ***as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less*** in transportation on public highways in interstate or foreign commerce, except vehicles –
>>
>>> (i) designed or used to transport more than 8 passengers (including the driver) for compensation;
>>>
>>> (ii) designed or used to transport more than 15 passengers (including the driver) and not used to transport passengers for compensation; or
>>>
>>> (iii) used in transporting material found by the Secretary of Transportation to be hazardous under section 5103 of title 49, United States Code, and transported in a quantity requiring placarding under regulations prescribed by the Secretary under section 5103 of title 49, United States

17

Code; and

(3) who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.* (emphasis added).

As the Southern District of Texas observed in *Allen v. Coil Tubing Servs., L.L.C.*:

> This change thus narrowed the range of employees who were covered by the MCA Exemption.  By this provision, Congress broke with its legislative tradition pursuant to which expansion of the [DOT]'s jurisdiction concomitantly narrowed the reach of the DOL's authority and thus the applicability of FLSA overtime provisions. Notwithstanding the MCA Exemption, under the TCA, the FLSA's overtime provisions now apply to any 'covered employee' as defined in section 306.  In substance, under the TCA, an employee of a motor carrier or motor private carrier … who works with 'non-commercial motor vehicles' defined as vehicles weighing 10,000 pounds or less may now be entitled to overtime compensation.

846 F. Supp. 2d at 692-93 (internal citations omitted); *see also O'Brien v. Lifestyle Transp., Inc.*, 956 F. Supp. 2d 300, 305 (D. Mass. 2013) ("Thus, even if subject to the jurisdiction of the Secretary of Transportation, an employer may still be obligated to pay its employees overtime if the employees meet the definition of a covered employee. And only those employees who operate vehicles of 10,000 pounds or less are 'covered employees.'"); *Vanzzini v. Action Meat Distribs.*, 11-cv-4173, 2014 U.S. Dist. LEXIS 13781, *20 (S.D. Tex. Jan. 31, 2014) ("[T]he TCA both restored the scope of the Secretary of Transportation's regulatory

18

jurisdiction to what it was prior to the enactment of SAFETEA-LU, and simultaneously narrowed the scope of the MCA [E]xemption.").

3.   The Clear Unambiguous Language of the TCA Narrows the Scope of the MCA Exemption

As discussed, Section 306 of the TCA made significant alterations to the MCA Exemption in June 2008 by limiting those individuals who are excluded from the FLSA's overtime premium compensation mandate while still retaining the DOT's jurisdiction over such employees. Specifically, the definition of "covered employees" entitled to FLSA overtime payments was expanded to include those individuals "whose work, in whole or *in part*, is defined . . . as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce." *See* TCA at Section 306(c) (emphasis added).

Congress' intention to extend the overtime premium compensation requirement to those individuals whose employment concerns 10,000 pound or less vehicles during at least part of their employment is clear based on the plain and unambiguous language of the TCA.  As the Third Circuit Court of Appeals has repeatedly recognized:

> The role of the courts in interpreting a statute is to give effect to Congress's intent.  Because it is presumed that Congress expresses its intent through the ordinary meaning of its language, every exercise of statutory interpretation begins with plain language of the statute itself. Where the statutory language is plain and unambiguous, further

19

> inquiry is not required, except in the extraordinary case where a literal
> reading of the language produces an absurd result.  Moreover, a court
> may depart from the plain language of a statute only by an
> extraordinary showing of a contrary congressional intent in the
> legislative history.  In interpreting a statute, courts should endeavor to
> give meaning to every word which Congress used and therefore
> should avoid an interpretation which renders an element of the
> language superfluous.

*Idahoan Fresh v. Advantage Produce*, 157 F.3d 197, 202 (3d Cir. 1998) (internal

quotations and citations omitted); *see also Parker*, 620 F.3d at 277-78; *Abdul-

Akbar v. McKelvie*, 239 F.3d 307, 313 (3d Cir. 2001). Furthermore, although a

statute should be interpreted in a fashion that does not defeat the congressional

purpose, *Public Citizen v. United States Dep't of Justice*, **491 U.S. 440**, 454-55,

109 S.Ct. 2558, 2266-67, 105 L.Ed.2d 377 (1989), ***a court may not rewrite an***

***unambiguous law***.  *Friedrich v. United States Computer Services,* 974 F.2d 409,

419 (3d Cir. 1992)  (emphasis supplied). Even if the court does not believe that

Congress intended a specific outcome when it drafted a law, the court "must give

effect to the unambiguously expressed intent of Congress." *Friends of Sakonnet v.*

*Dutra*, 738 F.Supp. 623, 633 (D.R.I.1990) (citing Chevron, U.S.A., Inc. v. Natural

Resources Defense Council, Inc., 467 U.S. 837, 842-43, 104 S.Ct. 2778, 2781, 81

L.Ed.2d 694 (1984)).

The TCA's insertion of the phrase "in part" represented a significant

legislative change to the parameters of the MCA Exemption because it required

that employees' work only involve the operation of vehicles weighing less than

10,001 pounds during a portion of their employment to be entitled to the FLSA's overtime protections.  The Supreme Court has repeatedly recognized that the terms such as "work" are to be construed "broadly."  *See*, *e.g.*, *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-28, 126 S. Ct. 514; 163 L. Ed. 2d 288 (2005)   Thus, Congress' utilization of such broad terms to define "covered employees" logically leads to the conclusion that its intention was that simply a more generalized analysis of the duties performed throughout an individual's employment is all that is required.

Furthermore, the TCA's "in whole or in part" language to Plaintiffs' employment should be consistent with our Supreme Court's interpretation of identical language in the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et. seq.  See CSX Transportation, Inc. v. McBride*, _ U.S. _, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011).   *CSX Transportation* concerned the appropriate causation jury charge for cases arising under § 51 of FELA, which "renders railroads liable for employees' injuries or deaths 'resulting ***in whole or in part*** from [carrier] negligence.'"   *Id.* at 2634; *see also* 45 U.S.C. § 51 ("Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . .").

The Supreme Court held that FELA's "in part" phrase should be interpreted

in accordance with the language Congress expressly utilized and include conduct "**"no matter how small**."" *CSX Transportation*, 131 S. Ct. at 2644. (emphasis added); *see also id.* at 2634 ("The charge proper in FELA cases, we hold, simply tracks the language Congress employed, informing juries that a defendant railroad caused or contributed to a plaintiff employee's injury if the railroad's negligence played **any part** in bringing about the injury.") (emphasis added). In reaching this conclusion, the *CSX Transportation* Court relied on FELA's ""humanitarian"" and ""remedial goal[s],"" *id.* at 2636, which mimic the objectives of the FLSA, *see* pages 11-12, *supra*.

4.   <u>Federal Courts Across the Country Have Similarly Relied on the Plain Meaning of "In Part" to Recognize the Expansion of the FLSA's Overtime Protections Through the TCA</u>

Several courts have agreed that the TCA limited the MCA Exemption and provided the FLSA's overtime protections to individuals who worked on vehicles weighing both more and less than 10,001 pounds. These opinions include:

- *McMaster v. E. Armored Servs., Inc.*, 2013 WL 1288613, *4 (D.N.J. March 26, 2013) ("The [TCA] clearly defines a covered employee to include individuals "whose work, in whole or in part . . . affect[s] the safety of operation of" non-commercial vehicles. [TCA] § 306(c)(2). ***It is embedded in the very definition of 'covered employees' that an employee's work need only involve the operation of non-commercial motor vehicles, in part, to be entitled to overtime.***") (emphasis added);

- *Allen v. Coil Tubing Services, L.L.C.*, 846 F. Supp. 2d 678, 705 (S.D. Tex. 2012) ("To be entitled to overtime pay, an employee must perform some meaningful work for more than an insubstantial time with vehicles weighing 10,000 pounds or less." And, "It appears the Court must determine for the

period after June 6, 2008 (the TCA period), when and how often each Plaintiff individually performed duties with non-commercial vehicles so as to qualify as a 'covered employee' [under the TCA].");

- *O'Brien v. Lifestyle Transp., Inc.*, 956 F. Supp. 2d 300, 305 (D. Mass. 2013) ("In sum, covered employees are entitled to overtime, regardless of the MCA [E]xemption.  The test is clear: if an employee works as a driver of motor vehicles that weigh less than 10,000 pounds in the provision of interstate transportation and is employed by a motor carrier, that employee is entitled to overtime pay under the FLSA.");

- *Vanzzini v. Action Meat Distribs.*, 11-cv-4173, 2014 U.S. Dist. LEXIS 13781, *25-27 (S.D. Tex. Jan. 31, 2014) ("After the SAFETEA-LU and TCA amendments, truck weight can be dispositive because the ***TCA carved out from the MCA exemption*** those drivers working with trucks weighing less than 10,000 pounds." The court denied the employer's summary judgment motion because a particular plaintiff "***may*** have been given an assignment to complete a business-related task" using a vehicle weighing less than 10,000 pounds) (emphasis added);

- *Botero v. Commonwealth Limousine Serv.*, 12-cv-10428, 2013 U.S. Dist. LEXIS 104947, *36 (D. Mass. Apr. 12, 2013) ("the TCA expressly recognized that covered employees would receive compensation under the FLSA even though they were under the jurisdiction of the [DoT].  Moreover, the statutory language notes that there is overtime coverage if the employee's work "in whole or in part" is on vehicles that weigh less than 10,000 pounds.");

- *Westberry v. William Joule Marine Transp., Inc.*, 12-cv-486, 2013 U.S. Dist. LEXIS 24882, *10 (M.D. Fla. Feb. 22, 2013) ("[A]lthough Plaintiffs as escort drivers affected the safety of the operation of the 18-wheeler semi-trucks, i.e., motor vehicles weighing 10,001 pounds or more, Plaintiffs also affected the safety of the operation of the vehicles they were driving and those vehicles undisputably weighed 10,000 pounds or less.  Thus, Plaintiffs are covered employees because their work, at least in part, was that of a driver affecting the safety of the operation of a vehicle weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce, and who performed duties on that vehicle.");

- *Hernandez v. Alpine Logistics, LLC*, 08-cv-6254, 2011 U.S. Dist. LEXIS 96708, *14, *17-18 (W.D.N.Y. Aug. 29, 2011) ("Congress determined that

even if the [MCA] Exemption applied to certain drivers, those drivers would still nevertheless be entitled to overtime compensation if they qualified as 'covered employees'" because "Section 306, clearly and unmistakably, provides that notwithstanding the existence of the [MCA] Exemption, employees who work on exclusively or in part on vehicles weighing less than 10,000 pounds are entitled to overtime compensation.");

- *Mayan v. Rydbom Express, Inc.*, 07-cv-2658, 2009 U.S. Dist. LEXIS 90525, *31 (E.D. Pa. Sept. 30, 2009) (holding that "Section 306(c) [of the TCA] clearly states that the employee's work need only 'in whole or in part' affect the safety of operation of vehicles weighing 10,000 pounds or less. . . . In short, the employees must simply perform *some work* on such vehicles" to be entitled to overtime pay).

Several of these courts reached this conclusion regarding the post-TCA claims even though the employees at issue *could have been asked* to operate vehicles weighing more than 10,000 *at any time* as part of their employment. *See*, *e.g.*, *Hernandez*, 08-cv-6254, 2011 U.S. Dist. LEXIS 96708, *4 ("Under the terms of their employment, any of the drivers could be required to drive any one of the vehicles regardless of its weight."); *Mayan*, 07-cv-2658, 2009 U.S. Dist. LEXIS 90525, at *3 ("A driver might drive a vehicle weighing more than 10,000 pounds on one day and then a vehicle weighing less than 10,000 pounds on the next day. Consequently, all drivers were trained to operate *any* of the vehicles in the fleet."). Thus, it is clear from the "in whole or in part" language of TCA section 306 (c) (2) that Congress contemplated mixed fleets and duties and nevertheless determined that drivers and other employees working with vehicles weighing 10,000 pounds or less should receive overtime pay under the FLSA if their duties included, even in

part, driving or working with noncommercial motor vehicles. Cases cited by the Defendant that rule otherwise are contrary to the express language of the TCA.

Even in cases that did not concern drivers of vehicles weighing both more and less than 10,000 pounds such as Plaintiffs in this lawsuit, district courts have regularly recognized that the plain and unambiguous language of the TCA drastically narrowed the confines of the MCA Exemption.

- *Brooks v. Halsted Communication, Ltd.*, 620 F. Supp. 2d 193, 198 (D. Mass. 2009) ("[T]he TCA reconfirmed that the MCA exemption was inapplicable to employees of motor carriers who drove motor vehicles that weighed 10,000 pounds or less. ***Given the sharp clarity of the TCA's language***, Defendants do not, and could not, dispute their obligation to pay FLSA overtime after June of 2008.") (emphasis added and internal citations omitted)

- *Bedoya v. Aventura Limousine & Transp. Serv.*, 11-cv-244432, 2012 U.S. Dist. LEXIS 128826, *11 (S.D. Fla. Sept. 11, 2012) ("'The Court pauses to emphasize that an employee's work need only in part involve the operation of non-commercial vehicles to be entitled to overtime. *See* Technical Corrections Act § 306(c). Thus, if more than a *de minimis* portion of Plaintiff's work involved driving non-commercial vehicles, he is eligible for overtime under the FLSA as a "covered employee."'")

- *Garza v. Smith International, Inc.*, 10-cv-100, 2011 U.S. Dist. LEXIS 22869, *8 (S.D. Tex. Mar. 7, 2011) ("The TCA reconfirmed that the MCA exemption does not apply to drivers operating motor vehicles that weigh 10,000 pounds or less.")

- *Miller v. Professional Transportation, Inc.*, 09-cv-0111, 2010 U.S. Dist. LEXIS 87940, *10-11 (S.D. Ind. Aug. 25, 2010) ("The net result of [the TCA] is that employees, who drive vehicles denoted in the Act as part of their employment that were once exempt from overtime prior to the passage of SAFETEA-LU, are now eligible for the benefits of overtime compensation by virtue of the fact that they are 'covered employees.'

Covered employees are those that drive vehicles weighing 10,000 pounds gross vehicle weight or less and are designed or used to transport 8 or few passengers, including the driver.")

- *Lucas v. Bell Trans*, 773F.Supp.2d 930, 939 (D. Nev., 2011) ("That § 306 abrogates the historical motor carrier exemption is clear, because subsection (a) states that the protections of § 207 of the **FLSA shall apply to covered employees—as defined in § 306(c)—'notwithstanding section 213(b)(1) of [the FLSA] (29 U.S.C. 213(b)(1)**).'") (emphasis added).

F.      Plaintiffs' Work and Duties "in whole or in part" Involved Motor Vehicles With Gross Vehicle Weight Ratings of 10,000 Pounds or Less

1.      Plaintiffs Performed Work And Duties as Drivers "in whole or in part" Involving Motor Vehicles With Gross Vehicle Weight Ratings of 10,000 Pounds or Less

The claims of Alvarado, Barrows, Holland and Newell and the other Plaintiffs in this lawsuit arise entirely *after* the enactment of the TCA. As shown in Paragraph II, Plaintiffs without a doubt performed numerous, meaningful and substantial work and duties as drivers of motor vehicles with gross vehicle weight ratings of 10,000 pounds or less while employed by Defendant during the relevant time period. (Exhibits A, B, C, D; Exhibits 1-59). All of the Plaintiffs testified that they routinely and on a weekly basis, and as part of their continuing job duties throughout their employment with Defendant drove the Ford F-250 pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota, Montana or other states transporting property in interstate commerce on public highways for Defendant's business-related purposes without any trailer attached to or towed by the Ford F-250. (Exhibits A, B, C, D; Exhibits 1-59). Plaintiffs state

26

that they drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much *or more* than they drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. *Id.* Alvarado asserts that he drove the Ford F-250 every day. (Exhibit A). Barrows asserts that he drove the Ford F-250 1-2 times per day. (Exhibit B). Holland testifies that he drove the Ford F-250 5-7 times per week. (Exhibit C). And Newell declares that he drove the Ford F-250 3-5 times per week. (Exhibit D). Plaintiffs drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part of Plaintiffs' required job duties whether servicing wells in North Dakota, Montana or other states. (Exhibits A, B, C, D; Exhibits 1-59). All Plaintiffs testified that they routinely drove the Ford F-250 to gas and fueling stations to load fuel in the slip tanks without towing or pulling an attached trailer of any kind. *Id.* According to Alvarado, in the remote locations that Plaintiffs worked servicing wells in North Dakota and Montana, fuel runs for the slip tank in the Ford F-250 from the well site to a fueling station could be substantial distances from 12 miles to 30 miles away. (Exhibit A). Holland and Barrows state that they have driven the Ford F-250 to fueling stations as far away as approximately 40-50 miles from the well site to retrieve fuel in the slip tanks for use by the well service equipment during a well service job. (Exhibits B and C). It is important to note,

that the average round-trip fuel run from the well site in the Ford F-250 retrieving *and* loading fuel in the slip tank for the well service equipment was approximately 1-1 ½ hours per trip. (Exhibits A, B, C, D). And, Plaintiffs made numerous trips per day to retrieve and load fuel for the well site. (Exhibits A, B, C, D; Exhibits 1-59). Without a doubt, these activities constitute substantial "work" (driving and loading), *in part*, with vehicles with gross vehicle weight ratings of 10,000 pounds or less for TCA "covered employee" purposes.

The Defendant attempts to intentionally paint a cloudy picture that the Ford F-250, when driven by Plaintiffs during a well service job, *always* had a fuel trailer attached making the vehicle a Department of Transportation regulated vehicle. (Doc. No. 51. pp.28-29). This is, of course, flat wrong and misleading. Plaintiffs have testified extensively that they performed numerous duties and substantial work with motor vehicles with gross vehicle weight ratings of 10,000 pounds or less without towing a trailer of any kind. (Exhibits A, B, C, D; Exhibits 1-59). The Ford F-250 towed a trailer driven by the supervisor at the beginning and ending of a well service job. *Id.   During* the well service job, the fuel trailer stayed on the well site location and Plaintiffs made fuel runs driving the Ford F-250 on the public highways, without an attached trailer, and loaded the slip tanks contained in the bed of the Ford F-250 at gas and fueling stations to replenish the equipment and the fuel trailer. *Id.*  Plaintiffs testify that they very rarely, if ever, pulled or

28

towed a trailer or fuel trailer behind the F-250 on the public highways when retrieving and loading fuel during a well service job. *Id.* In this regard, the Defendant offers a misleading and incomplete statement from Newell regarding the use of a fuel trailer. (Doc. No. 51. p.28).  Newell did not state *he always or only* hauls a trailer when driving the Ford F-250. In fact, he clarifies and completes his deposition testimony as follows:

Q:  Is that pretty common for you to have a trailer behind the pickup?

A:  Yes.

Q:  On the—while you're working jobs?

A:  ***Moving from***, yeah, ***location to location.***

Q:  You said most times you had one?

A:  ***On location,*** yes. (emphasis added). Newell Dep., Ex. E, 17:9-17:16.

But Newell further clarifies:

Q:  Is that fuel buffalo, is that that 600-gallon thing you were talking about?

A:  Yeah

Q:  It was pulled on a trailer?

A:  Yeah, it would be ***parked*** next to the fluid pump because it had the biggest tanks on it and then the slip tank or the pickup would drive around and fill up the slip tank and then fill up the equipment, back and forth, and then whenever we didn't have the fuel Buffalo, ***we'd have to make trips into town and fill up. I think the slip tank is 80 gallons or 60 gallons or something, but we'd have to make many trips*** out there. (emphasis added). Newell Dep., Ex. E, 45:9-45:21.

*But most importantly*, Defendant offers absolutely no evidence that any of the Plaintiffs *always* and *only* towed or pulled a trailer behind the Ford F-250, including Alvarado, Barrows, Holland or Newell. Plaintiffs specifically deny any such allegation. So, when the Defendant implies that the Ford F-250 always had a trailer attached, this implication is completely false.

Furthermore, Plaintiffs assert that they could be terminated if they refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to routinely and regularly driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to well site locations as required and directed by their supervisors prior to and after well service jobs for a particular day. (Exhibits A, B, C, D; Exhibits 1-59). As Plaintiffs testified above, "the pickup trucks or Ford F-250 Plaintiffs transported as part of the equipment needed for their job and duties and used by Plaintiffs and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers." *Id.* Plaintiffs testify that "A well service job could not be successfully and effectively completed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day." *Id.* Plaintiffs state that there was a constant and continuing need and a part of

30

Plaintiffs' job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. *Id.* Further, Plaintiffs state that the Ford F-250 was used as their mobile storage unit for their water, bags, supplies, tools and equipment needed on location for a well service job. *Id.* Finally, Plaintiffs state that the required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer. *Id.*

In this connection, Defendant wrongly states that this required driving by Plaintiffs to and from the man camps/hotels to the well site is not "compensable work time" because "[n]ormal travel from home to work is not work time" and thus "does not bring Plaintiffs under the TCA" citing the Portal-to-Portal Act, 29 U.S.C. § 254(a) (2014) and 29 C.F.R. § 785.35. (Doc. No. 51. pp.26-27). Defendant further avers that such required drive time should not be considered part of Plaintiffs "duties". *Id.*

The Defendant's reliance on this authority is misplaced. The appropriate regulation that applies to the Plaintiffs' required driving and transporting of the Ford F-250, the crew, supplies, tools and equipment to and from the man camps/hotels to the well site locations as described above is 29 C.F.R§ 785.41 which states in part:

Work Performed While Traveling:

"Any work which an employee is required to perform while traveling must, of course, be counted as hours worked. An employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding…" *Id.*

Saddled with their supervisors' orders and the required responsibility to safely drive members of the crew via the Ford F-250 pickup truck as well as transporting the truck, tools, equipment and supplies, Plaintiffs are absolutely "working" while performing this kind of driving as they travel as opposed to simply "riding". This required driving, because Plaintiffs are simultaneously "working", clearly falls within the parameters of "work" involving a vehicle with a gross vehicle weight rating of 10,000 pounds or less for TCA coverage purposes. The average drive time from the man camps/hotel to the well site was approximately 1 ½ to 2 hours. (Exhibits B and D). Thus, a single trip per week driving and transporting the Ford F-250, equipment and crew from the man camp to the well site (which each Plaintiff performed) is clearly more than *de minimis*. Because, said driving involves substantially more time than "only a few seconds or minutes of work". *See*, *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S.Ct. 1187, 1195, 90 L.Ed. 1515. (When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded). For the Defendant to allege that Plaintiffs' designation by their supervisors as drivers obligated to safely transport the lives of other crew members

32

and Defendant's property on the public highways for 2 hours as "meaningless" or "trifling" work is patently disingenuous. Notwithstanding, Plaintiffs allege that this driving was *required* because they could be terminated if they refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the Ford F-250, the crew, supplies and equipment to and from the man camps/hotels to well site locations. (Exhibits A, B, C, D; Exhibits 1-59). Moreover, when directed by their supervisors to drive the Ford F-250 and the crew from the well site, Plaintiffs were not relieved of their work/driving duties until the crew returned to the man camp or hotel. *Id.*

Additionally, Plaintiffs driving of the Ford F-250 at the beginning of the day from the man camp parking lot, where they were required to meet and a driver was designated, to the well site is compensable work time and thus shows that such driving establishes that Plaintiffs are "covered employees" under the TCA. 29 C.F.R. § 785.38 states in part as follows:

> Travel That Is All In A Day's Work:
>
> "Where an employee is required to report at a meeting place to receive instructions or to perform other work there, or to pick up and to carry tools, the travel from the designated place to the work place is part of the day's work, and must be counted as hours worked regardless of contract, custom, or practice." *Id.*

Thus, Plaintiffs' driving of the Ford F-250 to the well site *after* the required

meeting place at the man camp or hotel parking lot where they loaded and prepared to transport their tools and equipment, including the Ford F-250 as a very necessary tool or piece of equipment with the slip tank attached, and where a designated driver was appointed by their supervisor, was compensable work time "all in a day's work" and establishes TCA coverage; particularly, for the employee who performed the driving.

Importantly, as Plaintiffs state above, the pickup trucks or Ford F-250 Plaintiffs transported as part of the equipment needed for their job and duties and used by Plaintiffs and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells. (Exhibits A, B, C, D; Exhibits 1-59). A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. *Id.* The Ford F-250 was used as Plaintiffs' mobile storage unit for their water, bags, supplies, tools and equipment needed on location at a well service job *Id.* Plaintiffs assert that The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished with fuel and operating during a well service job. *Id. **If the Ford F-250 specially equipped with the slip tank was not driven to the well site by Plaintiffs and the other crew members daily, the***

**well service job could not be done.** *Id.* The Ford F-250 was used by Plaintiffs numerous times per day to retrieve and load fuel for the well site. *Id.* The Ford F-250 was not solely used for transporting the crew. *Id. See*, *Crenshaw v. Quarles Drilling Corp.,* 798 F.2d 1345, 1350 (10th Cir. 1986) (travel time in employer's vehicles taking tools to service drilling rigs was compensable); *D. A. & S Oil Well Servicing v. Mitchell,* 262 F.2d 552 (10th Cir.1958) (employees who transported equipment needed to service oil wells must be compensated for travel time.).

In addition, Plaintiffs anticipate that Defendant will attempt to argue that the equipment Plaintiffs transported and the fuel Plaintiffs constantly retrieved for use at the well site could have been delivered by other means, including by a third-party fuel service company. The Tenth Circuit has rejected such an argument. "As to the drivers of the pickup trucks, it is quite clear from the record that they are also transporting equipment without which the principal activities could not be performed. While this equipment could be transported by other means, so long as the pickups are used for that purpose, the drivers must be considered as performing services essential to the principal activity." *D. A. & S Oil Well Servicing, Inc.,* 262 F.2d at 555. Moreover, fuel deliveries were not often made to the well site by third parties. (Exhibit B).

Next, the Defendant unsuccessfully attempts to direct the Court's attention from Plaintiffs' substantial use and duties involving the Ford F-250 on the public

35

highways by alleging "driving on the customer's private well site does not bring the Plaintiffs under the TCA's coverage." (Doc. No. 51. p.27).   Specifically, Defendant alleges "Bellwether Plaintiff Newell testified that he also drove the F-250 around the well-site, refueling the coil tubing unit, fluid pump unit, and the other units at the site from the fuel tank mounted on the F-250. Newell Dep., Ex. H, 26:9-27:6." (Doc. No. 51. p.27).   Plaintiffs have clearly stated and testified in Paragraph II that they performed substantial work and duties driving, fueling, loading and retrieving fuel without an attached trailer of any kind, including a "buffalo trailer", on the public highways that brings them within the TCA's definition of "covered employee" without alleging *any* driving on a private well site. However, ***the proof offered by Defendant regarding this fueling on private property as testified by Newell, <u>backfires</u> and supports Plaintiffs' argument that the Ford F-250 was a necessary tool or piece of equipment absolutely required for Plaintiffs' work activities and Defendant's well service jobs***. Defendant does not, and has not denied, that Plaintiffs, such as Newell, performed essential fueling duties on private property using the Ford F-250 *and* the slip tanks. Therefore, Plaintiffs' driving of the Ford F-250 from the man camps to the well site as required by their supervisors and Defendant was compensable work time because transporting the Ford F-250 (with the slip tank contained in the bed of the pickup) to the well site was an *integral and indispensable part* of Plaintiffs' principal work

36

activities of servicing wells. "We hold that the driving of the trucks on which the units are mounted, and ***the driving of the pickups when used to transport necessary equipment, constitute activities which are an 'integral and indispensable' part of the principal activities of the employees doing the driving, and such services are therefore compensable."*** (emphasis added). *See*, *D. A. & S Oil Well Servicing, Inc.,* 262 F.2d at 555.  Moreover, fairly recently, the United States Supreme Court made it clear "that any activity that is `integral and indispensable' to a `principal activity' is itself a `principal activity' under § 4(a) of the Portal-to-Portal Act," and is thus compensable under the FLSA. *IBP, Inc. v. Alvarez,* 546 U.S. 21, 29, 126 S.CT. 514, 525, 163 L.Ed.2d 288 (2005).

Consistent with this ruling, the Portal-to-Portal Act "has been interpreted not to prohibit overtime compensation when active duties are performed during travel time." *Crenshaw,* 798 F.2d at 1350.

The daily driving of the Ford F-250 to the well site by Plaintiffs transporting the truck, necessary slip tank, tools, equipment and the crew primarily benefitted the Defendant. The Fifth Circuit has weighed in on this issue as well. In *Dunlop v. City Elec., Inc.,* 527 F.2d 394, 398-399 (5th Cir.1976), the  Fifth Circuit discussed the nature of preliminary and postliminary activities related to the Portal-to-Portal Act:

> ... Decisions construing the Portal-to-Portal Act in conjunction with
> the F.L.S.A. make clear that the excepting language of § 4 was

intended to exclude from F.L.S.A. coverage only those activities "predominantly ... spent in [the employees'] own interests". [*Jackson v. Air Reduction Co.,* 402 F.2d 521, 523 (6th Cir. 1968).] No benefit may inure to the company. [*Blum v. Great Lakes Carbon Corp.,* 418 F.2d 283, 287 (5th Cir.1969).] The activities must be undertaken "for [the employees'] own convenience, not being required by the employer and not being necessary for the performance of their duties for the employer." [*Mitchell v. Southeastern Carbon Paper Co.,* 228 F.2d 934 (5th Cir.1955).] The exemption was not intended to relieve employers from liability for "any work of consequence performed for an employer" [(*Secretary of Labor v. E.R. Field, Inc.,* 495 F.2d 749, 751 (1st Cir.1974))], from which the company derives "significant benefit". [*Cherup v. Pittsburgh Plate Glass Company,* 350 F.Supp. 386, 391 (N.D.W.Va.1972).] *Id* at 398-399.

Thus, because driving the Ford F-250 to and from the man camps to the well site by Plaintiffs was integral and indispensable work and activity connected with their principal activities of servicing wells, such driving duties constitute "work", in whole or in part, with vehicles with gross vehicle weight ratings of 10,000 pounds or less for TCA coverage purposes.

Related to the preceding paragraph, it is noteworthy to bring to the Court's attention that Defendant appears to believe that the language from the *Allen* case that "meaningful work for more than an insubstantial period of time" on vehicles weighing 10,000 pounds or less is *required* to satisfy the TCA's definition of "covered employee". (Doc. No. 51. p.27). First, as shown throughout Plaintiffs' Response, Plaintiffs' work and duties involved and performed with vehicles with gross vehicle weight ratings of 10,000 pounds or less *easily* satisfies this *alleged* requirement. However, with all due respect to the *Allen* court, **there is absolutely**

**no requirement set forth in the plain and unambiguous language of the TCA** that in order to be a "covered employee" entitled to overtime wages the employee must perform "meaningful work for more than an insubstantial period of time" on a vehicle weighing 10,000 pounds or less. The TCA is totally devoid of these alleged "requirements". If Congress wanted to include these alleged requirements, it could have done so. It did not. As stated above, "a court may not re-write an unambiguous law." *Freidrich*, 974 F.2d at 419. It appears that the *Allen* court is attempting to "re-write" the TCA by adding requirements for TCA coverage to be applied to each, individual employee. Interestingly, Judge Ellison did not even mention these alleged "requirements" in *Vanzzini* when he denied the employer's motion for summary judgment concerning the application of the TCA exception to the Motor Carrier Act exemption. *Vanzzini v. Action Meat Distribs.*, 11-cv-4173, 2014 U.S. Dist. LEXIS 13781, *25-27 (S.D. Tex. Jan. 31, 2014).  Along the same lines, **there is absolutely no "de minimis" provision or requirement in the TCA**, either. And, notably, Judge Ellison did not mention this alleged requirement in *Vanzzini* related to the employee's coverage under the TCA. Regardless, Plaintiffs have submitted overwhelming evidence that their substantial work and duties involving the Ford F-250 greatly exceeded and surpassed any alleged *de minimis* or "trifling" standard or limitation.

Also as a continuing part of Plaintiffs' job duties, Plaintiffs would routinely

drive the Ford F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without any trailer attached from business establishments engaged in interstate commerce. (Exhibits A, B, C, D; Exhibits 1-59). This is another instance of Plaintiffs' work involving motor vehicles with gross vehicle weight ratings of 10,000 pounds or less that Defendant has failed to bring to the Court's attention in its Motion.

Finally, Defendant presents the red herring argument that Plaintiffs are not entitled to overtime wages because their "primary duty" was that of "operators" who were hired "to drive the big trucks and operate the units on them 12 hours per day at customer wellsites." (Doc. No.51. pp.18-19). First, there is ***nothing in the TCA that requires*** that in order to be a "covered employee" the employee's "primary duty" must be a driver, driver's helper, loader or mechanic *OR* that an employee must be expressly and specifically hired and hold the primary job title of a driver, driver's helper, loader or mechanic of vehicles weighing less than 10,000 pounds. Again, if Congress wanted coverage under the TCA to be based *entirely* on an employee's orally expressed or written job title without an examination or analysis of the work performed, it could have said so. It did not. And second, as the Tenth Circuit explained "It is true, as contended by the defendant, that driving a truck is a totally different type of activity from that performed by such driver-employee at the well site. But employees who transport equipment without which

40

well servicing could not be done, are performing an activity which is so closely related to the work which they and the other employees perform, that it must be considered an integral and indispensable part of their principal activities." *D. A. & S Oil Well Servicing, Inc.,* 262 F.2d at 555.

In this regard, all that is necessary for coverage under the TCA is that an employee performs duties or ***some work*** "in whole or in part" on vehicles weighing 10,000 pounds or less. The term "duties" is not that difficult to comprehend and its everyday usage in parlance is easy to grasp.  Merriam-Webster defines "duty" as "something that is done as part of a job". *See,* "duty" Def. 1. *Merriam Webster Online,* Merriam Webster, n.d. Web. 19 Aug. 2014. Then, under this very simple definition, because driving the Ford F-250 was something that was done as part of Plaintiffs' job, which they have conclusively proven, it *must* have been a duty. This is, perhaps, the reason Congress uses the plain, unambiguous phrase "in whole or ***in part***" in the TCA. Moreover, the Supreme Court has repeatedly recognized that the terms such as "work" are to be construed "broadly."  *See*, *e.g.*, *IBP, Inc. v. Alvarez*, 546 U.S. 21, 25-28, 126 S. Ct. 514; 163 L. Ed. 2d 288 (2005).  Thus, Congress' utilization of such broad terms to define "covered employees" logically leads to the conclusion that its intention was that a more generalized analysis of the duties performed throughout an individual's employment is all that is required. Additionally, TCA coverage, like all exemptions under the FLSA should reflect the

realities of the job. *See*, *e.g.*, *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 707 (the district court "shall not be concluded by the name which may have been given to [the employee's] position or to the work that he does"); *Ale v. Tenn. Valley Auth.*, 269  F.3d 680, 688-89 (6th Cir. 2001) ("[C]ourts must focus on the *actual activities* of the employee in order to determine whether or not he is exempt from the FLSA's overtime regulations.") (emphasis added).

In short, Plaintiffs performed substantial work and duties as drivers of motor vehicles with gross vehicle weight ratings of 10,000 pounds or less on the public highways for Defendant's business-related purposes, and thus, have established that they are "covered employees" entitled to overtime wages under the FLSA notwithstanding the alleged MCA exemption. At the very least, Plaintiffs have created genuine issues of material fact that preclude the granting of Defendant's Motion for Summary Judgment.

2. <u>Plaintiffs Performed Work and Duties as Loaders "in whole or in part" Involving Motor Vehicles With Gross Vehicle Weight Ratings of 10,000 Pounds or Less</u>

As shown in Paragraph II, Plaintiffs performed substantial work and duties, *in part*, as loaders of motor vehicles with gross vehicle weight ratings of 10,000 pounds or less. Thus, they are covered employees for TCA purposes and entitled to their overtime wages under the FLSA.

Plaintiffs state that during well service jobs whether in North Dakota,

Montana or other states, Plaintiffs would routinely drive the pickups or the Ford F-250 to a fueling station. (Exhibits A, B, C, D; Exhibits 1-59). Plaintiffs would then load the fuel in the slip tanks. *Id*. While loading the fuel in the slip tanks, Plaintiffs had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. *Id*. Furthermore, Plaintiffs would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, fluids, oils and lubricants used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. *Id*. Plaintiffs assert that they performed loading duties on a weekly basis during the relevant time period. *Id*. Therefore, Plaintiffs are "covered employees" because their work and duties were performed, *in part*, as "loaders" under the TCA and thus they are entitled to overtime protection pursuant to the FLSA.

3. Plaintiffs Performed Work and Duties as Mechanics "in whole or in part" Involving Motor Vehicles With Gross Vehicle Weight Ratings of 10,000 Pounds or Less

As shown in Paragraph II, Plaintiffs also performed substantial work and duties, *in part*, as mechanics of motor vehicles with gross vehicle weight ratings of

10,000 pounds or less. Thus, they are covered employees for TCA purposes and entitled to their overtime wages under the FLSA.

Plaintiffs state that they routinely performed, or assisted other employees in performing, as part of Plaintiffs' continuing job duties, mechanic, maintenance, inspection, adjustment and repair duties on Defendant's Ford F-250s and other vehicles with gross vehicle weight ratings of 10,000 pounds or less that were regularly used and engaged in interstate commerce on the public highways during the relevant time period including but not limited to motor fluids, power steering and brake fluids, lights, headlights, tail lights, windshield wipers and inspecting air pressure in tires. (Exhibits A and C).

Therefore, Plaintiffs are "covered employees" because their work and duties were performed, *in part*, as "mechanics" under the TCA and thus they are entitled to overtime protection pursuant to the FLSA notwithstanding the MCA exemption.

## IV.    CONCLUSION

The Technical Corrections Act of 2008 controls the application of the overtime provisions of the FLSA to Plaintiffs in this matter. Pursuant to that statute, Plaintiffs are, as a matter of law, entitled to overtime wages under the FLSA because they are "covered employees" under the FLSA and the Technical Corrections Act of 2008 because they performed work "in whole or in part" with vehicles with gross vehicle weight ratings of 10,000 pounds or less in performance

44

of their duties as well service employees. As a result, Defendant's Motion For Summary Judgment should be denied in its entirety as to all Plaintiffs.

Respectfully submitted,

By:/s/ Clark Woodson III
CLARK WOODSON III
601 East Myrtle
Angleton, Texas 77515
(979) 849-6080 Telephone
State Bar No. 00794880
S.D. Bar No. 21481
**Attorney for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of ***Plaintiffs' Response to Defendant Warrior Energy Services Corporation's Motion for Summary Judgment*** has been served on the following counsel of record via the court's Case Management/Electronic Case Files (CM/ECF) system on this the 6th day of September, 2014.

William John Bux
600 Travis Street, Suite 2800
Houston, Texas 77002

/s/  Clark  Woodson  III
Clark Woodson III

45