IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF MICHAEL ALVARADO

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

    1.     "My name is Michael Alvarado. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

    2.     Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

    3.     Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and Montana. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

    4.     I worked with, worked on, drove or loaded the above described pickup trucks every day during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

**EXHIBIT "A"**

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or Montana. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or Montana performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. The average round-trip fuel run from the well site in the Ford F-250 retrieving and loading fuel in the slip tank for the well service equipment was approximately 1-1 ½ hours per trip. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. In the remote locations that we worked servicing wells in North Dakota and Montana, fuel runs for the slip tanks in the Ford F-250 from the well site to a fueling station could be substantial distances from 12 miles to 30 miles away. During well service jobs whether in North Dakota or Montana, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, fluids, oils and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and

fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and Montana transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without any trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in

interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotel to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties. I drove to and from the man camps and well sites just as much as the supervisor. This driving was generally equally shared with each member of the crew and the supervisor.

DJ Justus, the alleged Vice President of Coil Tubing for Warrior, did not work on any well service jobs with me nor did he witness any of my or my supervisors' work activities involving the Ford F-250 while on a well service job.

Furthermore, as part of my continuing duties, I routinely performed, or assisted other employees in performing, as part of my continuing job duties, mechanic, maintenance, inspection, adjustment and repair duties on Defendant's Ford F-250s and other vehicles with gross vehicle weight ratings of 10,000 pounds or less that were regularly used and engaged in interstate commerce on the public highways during the relevant time period including but not limited to motor fluids, power steering and brake fluids, lights, headlights, tail lights windshield wipers and inspecting air pressure in tires.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __09/05/2014__.
                                    Date

_____
Michael Alvarado

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF MATTHEW SCOTT BARROWS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Matthew Scott Barrows. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and Montana. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks every day, driving at least 1-2 times per day, during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250

EXHIBIT "B"

transporting property in interstate commerce for Defendant's business-related reasons just as much or more than I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or Montana. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or Montana performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. The average round-trip fuel run from the well site in the Ford F-250 retrieving and loading fuel in the slip tank for the well service equipment was approximately 1-1 ½ hours per trip. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. Fuel deliveries were not often made to the well site by third parties. I have driven the Ford F-250 to fueling stations as far away as approximately 40-50 miles from the well site to retrieve fuel in the slip tank for use by the well service equipment during a well service job. During well service jobs whether in North Dakota or Montana, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, fluids, oils and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this

fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and Montana transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without any trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in

interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties. The average drive time from the man camps/hotel to the well site was approximately 2 hours.

DJ Justus, the alleged Vice President of Coil Tubing for Warrior, did not work on any well service jobs with me nor did he witness any of my or my supervisors' work activities involving the Ford F-250 while on a well service job.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/05/2014___.
                                         Date

_____
Matthew Scott Barrows

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF CODY HOLLAND

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.  "My name is Cody Holland. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.  I was employed by Defendant primarily as a well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.  Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove, loaded and performed maintenance on pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and Montana. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds. However, for approximately the first 9-10 months of my employment with Defendant, I did not have a commercial driver's license and I did not drive any of the equipment needed to service wells for Defendant's business-related purposes with gross vehicle weight ratings of more than 10,000 pounds in furtherance of Defendant's business across state lines. During the approximate first 9-10 months of my employment with Defendant during the relevant time period, I drove the pickup trucks or Ford F-250 daily and exclusively carrying or transporting Defendant's property as part of my job duties in interstate commerce on the public highways.



EXHIBIT "C"

4. I worked with, worked on, drove or loaded the above described pickup trucks at least 5-7 times per week during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons more than I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or the Ford F-250 in interstate of foreign commerce carrying Defendant's property on public highways during most, if not all, well service jobs as part of my required job duties whether in North Dakota or Montana. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or Montana performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. The average round-trip fuel run from the well site in the Ford F-250 retrieving and loading fuel in the slip tank for the well service equipment was approximately 1-1 ½ hours per trip. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. I have driven the Ford F-250 to fueling stations as far away as approximately 40-50 miles from the well site to retrieve fuel for the slip tanks for use by the well service equipment during a well service job. During well service jobs whether in North Dakota or Montana, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not to limited foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the F-250 and would

exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of slip the tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs for Defendant's customers. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard" or when other crew members were too tired or fatigued to drive. Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant, such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and Montana transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without any trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive,

3

load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties. This driving was generally equally shared with each member of the crew and the supervisor.

DJ Justus, the alleged Vice President of Coil Tubing for Warrior, did not work on any well service jobs with me nor did he witness any of my or my supervisors' work activities involving the Ford F-250 while on a well service job.

Furthermore, as part of my continuing duties, I routinely performed, or assisted other employees in performing, as part of my continuing job duties, mechanic, maintenance, inspection, adjustment and repair duties on Defendant's Ford F-250s and other vehicles with gross vehicle weight ratings of 10,000 pounds or less that were regularly used and engaged in interstate commerce on the public highways during the relevant time period including but not limited to motor fluids, power steering and brake fluids, lights, headlights, tail lights, windshield wipers and inspecting air pressure in tires.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on 09/05/2014.
                                    Date                          Randall Newell

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF RANDALL NEWELL

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Randall Newell. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and Montana. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks 3-5 times per week during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. However, when the well service jobs I worked on lasted less than a week, I drove or loaded the



EXHIBIT "D"

pickups or the Ford F-250 2-5 times per week during every week of my scheduled shifts in interstate and foreign commerce carrying Defendant's property on public highways. During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or Montana. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or Montana performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. The average round-trip fuel run from the well site in the Ford F-250 retrieving and loading fuel in the slip tank for the well service equipment was approximately 1-1 ½ hours per trip. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or Montana, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and Montana transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce

3

including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties. The average drive time from the man camps/hotel to the well site was approximately 1 1/2 hours.

DJ Justus, the alleged Vice President of Coil Tubing for Warrior, did not work on any well service jobs with me nor did he witness any of my or my supervisors' work activities involving the Ford F-250 while on a well service job.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on  09/05/2014  .
                                                                Date

*Randall Newell*
_____
Randall Newell