# Non-Bellwether Plaintiff Declarations

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins | Exhibit "1" | Mark Noble | Exhibit "31" |
| Humberto Alexander Ayala | Exhibit "2" | Joseph Wayne Ortego | Exhibit "32" |
| Weston Berg | Exhibit "3" | Juan Palacios | Exhibit "33" |
| John Black | Exhibit "4" | David Perez | Exhibit "34" |
| Gary Bond | Exhibit "5" | Brian Porter | Exhibit "35" |
| Lloyd Bond | Exhibit "6" | William Reef | Exhibit "36" |
| Jonas Daniel Bontrager | Exhibit "7" | Anthony Scott Reeves | Exhibit "37" |
| Greg Duane Case | Exhibit "8" | Matthew Resendez | Exhibit "38" |
| Cory Cummings | Exhibit "9" | Joshua Mark Robin | Exhibit "39" |
| David Davis | Exhibit "10" | Charlie Rogers | Exhibit "40" |
| Kevin Dennis | Exhibit "11" | Daniel Rouhan | Exhibit "41" |
| Riley Douthit | Exhibit "12" | Zackery Rouhan | Exhibit "42" |
| David Ellifritz | Exhibit "13" | Scott Alan Rowley | Exhibit "43" |
| Kevin Shane Fontenot | Exhibit "14" | Brian Hampton Smith | Exhibit "44" |
| Christopher Gale | Exhibit "15" | Emmett Snyder | Exhibit "45" |
| Jason Gordon | Exhibit "16" | Bruce Stelzried | Exhibit "46" |
| Dana Gross | Exhibit "17" | Joseph Strong | Exhibit "47" |
| Alex Haspert | Exhibit "18" | Javan Terral | Exhibit "48" |
| David Henry | Exhibit "19" | Brent Thompson | Exhibit "49" |
| Eric Hobson | Exhibit "20" | Keith Turner | Exhibit "50" |
| Ben Hoyle | Exhibit "21" | Guadalupe Valdez | Exhibit "51" |
| James D. Jones | Exhibit "22" | Jakab Vamos | Exhibit "52" |
| Arthur Perry Kennedy | Exhibit "23" | Jeff Walker | Exhibit "53" |
| Daniel J. Knack | Exhibit "24" | Mike Ware | Exhibit "54" |
| Trent Krieger | Exhibit "25" | Jason Watkins | Exhibit "55" |
| Douglas Kruse | Exhibit "26" | Kirn Wayne | Exhibit "56" |
| Ralph Meixsell | Exhibit "27" | Aaron Willard | Exhibit "57" |
| Ryan Mooney | Exhibit "28" | Jonathan Wirges | Exhibit "58" |
| Harold James Narcisse | Exhibit "29" | Scott Witzig | Exhibit "59 |
| Brandon Newell | Exhibit "30" | | |

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF DONNIE EUGENE AIKINS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

 1.  "My name is Donnie Eugene Aikins. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

 2.  Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

 3.  Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

 4.  I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT " 1 "

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.    The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.       During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.       Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.       The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __09/03/2014_____.
                                              Date

Donnie Aikins
_____
Print Name

_____
Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF HUMBERTO ALEXANDER AYALA

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Humberto Alexander Ayala. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/28/2014___.
Date

Humberto Alexander Ayala
Print Name

Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | § | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF WESTON BERG

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.     "My name is Weston Berg. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.     Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.     Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.     I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "3"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on   08/29/2014
                                    _____.
                                           Date

                                    Weston Berg
                                    _____
                                    Print Name

                                    _____
                                    Signature

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

Donnie Eugene Aikins, et al.           §
                            Plaintiffs    §
                                             §
vs.                                     §
                                        §   Civil Action No. 6:13-cv-00054
                                        §
Warrior Energy Services Corp.           §
                            Defendant    §


DECLARATION OF JOHN BLACK

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

     1.    "My name is John Black. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

     2.    Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

     3.    Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

     4.    I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT "4"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the Ford F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/30/2014___.
                                             Date

                                        John Black
                                        _____
                                        Print Name

                                        _____
                                        Signature

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

Donnie Eugene Aikins, et al.          §
                                      Plaintiffs          §
                                                          §
vs.                                   §
                                      §          Civil Action No. 6:13-cv-00054
                                      §
Warrior Energy Services Corp.         §
                                      Defendant          §

### DECLARATION OF GARY BOND

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

      1.     "My name is Gary Bond. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

      2.     Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

      3.     Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

      4.     I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT "5"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/30/2014_____.
                                                                    Date

                                                                    Gary Bond
                                                                    _____
                                                                    Print Name

                                                                    _____
                                                                    Signature

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

## DECLARATION OF LLOYD BOND

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

　　　1.　　"My name is Lloyd Bond. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

　　　2.　　Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

　　　3.　　Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

　　　4.　　I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT "6"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/01/2014___.
                                        Date

Lloyd Bond
_____
Print Name

_____
Signature

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

Donnie Eugene Aikins, et al.                   §
                                  Plaintiffs   §
                                               §
vs.                                            §
                                               §   Civil Action No. 6:13-cv-00054
                                               §
Warrior Energy Services Corp.                  §
                                  Defendant    §


## DECLARATION OF JONAS DANIEL BONTRAGER

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Jonas Daniel Bontrager. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

# EXHIBIT "7"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __8/30/2014_____.
                                                      Date


                                              Jonas Daniel Bontrager
                                              _____
                                              Print Name

                                              Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF GREG DUANE CASE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Greg Duane Case. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "8"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on  08/30/2014 .
                                                        Date

                                    Greg Duane Case
                                    Print Name

                                    Greg D Case
                                    Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

## DECLARATION OF CORY CUMMINGS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.    "My name is Cory Cummings. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.    Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.    Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.    I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT "9"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/29/2014___.
                                                                    Date

cory cummings
_____
Print Name

_____
Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF DAVID DAVIS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is David Davis. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "10"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on   09/01/2014   .
                                              Date

David P Davis
Print Name

David P. Davis
Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

Donnie Eugene Aikins, et al.                     §
                                     Plaintiffs    §
                                                         §
vs.                                                §
                                                   §    Civil Action No. 6:13-cv-00054
                                                   §
Warrior Energy Services Corp.                §
                                     Defendant    §

DECLARATION OF KEVIN DENNIS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Kevin Dennis. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



EXHIBIT "11"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/30/2014____.
                                        Date


                                        Kevin Lynn Dennis
                                        _____
                                        Print Name


                                        _Kevin L. Dennis_
                                        _____
                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF RILEY DOUTHIT

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Riley Douthit. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "12"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the Ford F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.    During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.    Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.    The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on   08/30/2014  .
                        Date

Riley Douthit
Print Name

Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF DAVID ELLIFRITZ

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is David Ellifritz. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "13"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the Ford F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on  9/07/2014
_____.
                                                                        Date


                                                        David Ellifritz
                                                        _____
                                                        Print Name

                                                        _____
                                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

## DECLARATION OF KEVIN SHANE FONTENOT

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

      1.      "My name is Kevin Shane Fontenot. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

      2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

      3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

      4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

# EXHIBIT "14"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

l have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __08/29/2014_____.
                                                              Date


                                                 Kevin Fontenot
                                                 _____
                                                 Print Name

                                                 _____
                                                 Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF CHRISTOPHER GALE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Christopher Gale. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "15"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/29/2014___.
                                          Date


                                    Christopher G Gale
                                    _____
                                    Print Name

                                    C G. Gale
                                    _____
                                    Signature


4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al.　　　　§
　　　　　　　　　　　　　Plaintiffs　§　　　§
　　　　　　　　　　　　　　　　　　　　§
vs.　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　　§　　Civil Action No. 6:13-cv-00054
　　　　　　　　　　　　　　　　　§
Warrior Energy Services Corp.　　§
　　　　　　　　　　　　　Defendant　§

DECLARATION OF JASON GORDON

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

　　　　1.　　"My name is Jason Gordon. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

　　　　2.　　Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

　　　　3.　　Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

　　　　4.　　I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "16"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/30/2014_____.
                                                    Date

                                                    jason gordon
                                                    _____
                                                    Print Name

                                                    _____
                                                    Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF DANA GROSS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Dana Gross. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/02/2014___.
                                                          Date

                                        Dana R Gross
                                        _____
                                        Print Name

                                        _____
                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF ALEX HASPERT

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Alex Haspert. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "18"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __09/02/2014_____.
                                                   Date

Alex M. Haspert
_____
Print Name

_____
Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| | Plaintiffs § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| | Defendant § | |

DECLARATION OF DAVID HENRY

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is David Henry. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "19"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel tanks) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/29/2014___.
                                                    Date

david henry
_____
Print Name

_____
Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| | § | |
| Warrior Energy 5ervices Corp. | § | |
| Defendant | § | |

DECLARATION OF ERIC HOBSON

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Eric Hobson. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "20"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/01/2014___.
                                        Date

                                        Eric T Hobson
                                        _____
                                        Print Name

                                        _____
                                        Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| | Plaintiffs | § | |
| | | | § |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| | Defendant | § | |

DECLARATION OF BEN HOYLE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Ben Hoyle. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "21"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the Ford F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/30/2014_____.

                                          Date

Ben Hoyle

_____

Print Name

_____

Signature

4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

## DECLARATION OF JAMES D. JONES

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is James D. Jones. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "22"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.    The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/29/2014___.
                                                                    Date

James D. Jones
_____
Print Name

_____
Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al.          §
                              Plaintiffs     §
                                                §
vs.                                          §
                                             §    Civil Action No. 6:13-cv-00054
                                             §
Warrior Energy Services Corp.                §
                              Defendant      §


DECLARATION OF ARTHUR PERRY KENNEDY

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Arthur Perry Kennedy. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "23"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on  _08/29/2014_____.
                                                          Date

                                        Arthur P. Kennedy
                                        _____
                                        Print Name

                                        _Arthur P Kennedy_
                                        _____
                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

Donnie Eugene Aikins, et al.                  §
                              Plaintiffs      §
                                                      §
vs.                                           §
                                              §    Civil Action No. 6:13-cv-00054
                                              §
Warrior Energy 5ervices Corp.                 §
                              Defendant        §


DECLARATION OF DANIEL J. KNACK

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

     1.    "My name is Daniel J. Knack. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

     2.    Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

     3.    Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

     4.    I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "24"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.     During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.     Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.     The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on   08/30/2014         .
                                                     Date

Daniel Knack
_____
Print Name

_____
Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF TRENT KRIEGER

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Trent Krieger. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "25"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/02/2014___.
                                                           Date

                                          Trent L. Krieger
                                          _____
                                          Print Name

                                          _Trent L. Krieger_ (signature)
                                          Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF DOUGLAS KRUSE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Douglas Kruse. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "26"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on  8/29/2014 .
                                    Date

Douglas A Kruse
Print Name

Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al.      §
                                 Plaintiffs     §
                                                        §

vs.                                      §
                                     §     Civil Action No. 6:13-cv-00054
                                     §

Warrior Energy Services Corp.      §
                               Defendant     §

DECLARATION OF RALPH MEIXSELL

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

      1.    "My name is Ralph Meixsell. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

      2.    Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

      3.    Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

      4.    I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "27"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __09/03/2014_____.
                                                              Date


                                          Ralph meixsell
                                          _____
                                          Print Name


                                          _____
                                          Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | | § |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF RYAN MOONEY

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

      1.     "My name is Ryan Mooney. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

      2.     Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

      3.     Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

      4.     I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT "28"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/04/2014___.
                                                    Date

                                        Ryan Mooneyw
                                        _____
                                        Print Name


                                        Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF HAROLD JAMES NARCISSE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Harold James Narcisse. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "29"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___9/02/2014___.
                                      Date

Harold Narcisse
_____
Print Name

_____
Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

Donnie Eugene Aikins, et al.                    §
                          Plaintiffs    §
                                     §

vs.                                              §
                                   §    Civil Action No. 6:13-cv-00054
                                 §

Warrior Energy Services Corp.                    §
                         Defendant    §

DECLARATION OF BRANDON NEWELL

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Brandon Newell. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



EXHIBIT "30"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___9/01/2014_____.
                                                 Date

Brandon Newell
_____
Print Name

_____
Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF MARK NOBLE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Mark Noble. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "31"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __08/29/2014_____.
                                                        Date

                                            Mark Noble
                                            _____
                                            Print Name

                                            _Mark Noble_
                                            _____
                                            Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | § | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF JOSEPH WAYNE ORTEGO

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

     1.    "My name is Joseph Wayne Ortego. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

     2.    Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

     3.    Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

     4.    I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "32"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/03/2014___.
                                         Date

                                    Joseph W. Ortego
                                    _____
                                    Print Name


                                    _____
                                    Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| | Plaintiffs | § | |
| | | | § |
| vs. | § | | |
| | § | | Civil Action No. 6:13-cv-00054 |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| | Defendant | § | |


DECLARATION OF JUAN PALACIOS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Juan Palacios. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "33"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___9/03/2014_____.
                                                      Date

                                        Juan v. Palacios
                                        _____
                                        Print Name


                                        _____
                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF DAVID PEREZ

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is David Perez. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "34"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___09/02/2014___.
                                          Date


                                    Daniel perez
                                    _____
                                    Print Name

                                    _____
                                    Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF BRIAN PORTER

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Brian Porter. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "35"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.    The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/30/2014___.
                                                          Date


                                        Brian Porter
                                        _____
                                        Print Name


                                        Signature


4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF WILLIAM REEF

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is William Reef. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, l routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours l worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/31/2014___.
                                              Date

                                         William Reef
                                         _____
                                         Print Name

                                         _____
                                         Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

**DECLARATION OF ANTHONY SCOTT REEVES**

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.     "My name is Anthony Scott Reeves. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.     Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.     Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.     I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ____09/02/2014____.
                                     Date

                                                    Anthony Scott Reeves
                                                    _____
                                                    Print Name

                                                    Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF MATTHEW RESENDEZ

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Matthew Resendez. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "38"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on <u>08/28/2014</u>.
Date

Matthew E Resendez
_____
Print Name

_____
Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF JOSHUA MARK ROBIN

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Joshua Mark Robin. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "39"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on __9/02/2014_____.
                                                      Date


                                    Joshua rob
                                    _____
                                    Print Name

                                    _____
                                    Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

**DECLARATION OF CHARLIE ROGERS**

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Charlie Rogers. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



EXHIBIT "40"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing tbese duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on   08/28/2014                 .
                                          Date


                                    charlie rogers
                                   _____
                                    Print Name

                                    Charlie Rogers
                                    Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF DANIEL ROUHAN

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Daniel Rouhan. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate


EXHIBIT "41"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

5igned under penalty of perjury on ___08/28/2014___.
Date

Daniel Rouhan
_____
Print Name

_____
5ignature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF ZACKERY ROUHAN

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Zackery Rouhan. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "42"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/28/2014___.
Date

Zackery Rouhan
_____
Print Name

_____
Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al. §
                                    Plaintiffs  §
                                                         §
vs.                                 §
                                    §   Civil Action No. 6:13-cv-00054
                                    §
Warrior Energy Services Corp.       §
                                    Defendant  §


DECLARATION OF SCOTT ALAN ROWLEY

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Scott Alan Rowley. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.


2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.


3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.


4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT "43"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 moving the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/30/2014_____.
                                                       Date


                                        Scott Rowley
                                        _____
                                        Print Name


                                        _____
                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF BRIAN HAMPTON SMITH

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Brian Hampton Smith. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___9/01/2014___.
                                              Date

                                    Brian Dmith
                                    _____
                                    Print Name

                                    Brian Smith
                                    _____
                                    Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF EMMETT SNYDER

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Emmett Snyder. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit



During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/29/2014_____.
                                                    Date

Emmett w Snyder
_____
Print Name

_____
Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al.                    §
                                  Plaintiffs    §        §
                                                         §
vs.                                             §
                                                §        Civil Action No. 6:13-cv-00054
                                                §
Warrior Energy Services Corp.                   §
                                  Defendant     §

DECLARATION OF BRUCE STELZRIED

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Bruce Stelzried. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "46"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

2

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on _____.
                                       09/03/2014
                                         Date

Bruce Stelzried
Print Name

Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF JOSEPH STRONG

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Joseph Strong. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "47"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

2

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/29/2014___.
                                                     Date

___Joseph Strong___
Print Name

_____
Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF JAVAN TERRAL

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Javan Terral. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

2

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.     During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.     Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.     The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on _____.
                                         09/03/2014
                                           Date

                                   _____
                                   Javan Terral
                                   Print Name

                                   _____
                                   Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF BRENT THOMPSON

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Brent Thompson. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-2S0 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-2S0 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on   08/29/2014   .
                                          Date

                                          Brent Thompson
                                          Print Name

                                          [signature]
                                          Signature

4

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF TEXAS
### VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF KEITH TURNER

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Keith Turner. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate


EXHIBIT "50"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

2

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ~~09/05/2014~~.
                                                        Date


                                        ~~Keith Turner~~
                                        Print Name


                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF GUADALUPE VALDEZ

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Guadalupe Valdez. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "51"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

2

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/30/2014_____.
                                                                    Date


                                                    Guadalupe Valdez
                                                    Print Name

                                                    _____
                                                    Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | |
| | § | |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF JAKAB VAMOS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.      "My name is Jakab Vamos. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.      Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.      Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.      I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "52"

commerce for Defendant's business-related reasons just as much as l drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. l drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. l would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, l would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, l would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment l loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 l transported as part of the equipment needed for our job and duties and used by me and the crew at well service

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ~~09/03/2014~~.
                                                    Date

~~Jakab Vamos~~
Print Name

Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy 5ervices Corp. | § | |
| Defendant | § | |

DECLARATION OF JEFF WALKER

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.    "My name is Jeff Walker. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.    Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.    Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.    I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "53"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

2

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.     During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.     Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.     The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/31/2014_____.
                                                          Date

Jeff Walker
Print Name

Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al.　　　　§
　　　　　　　　　　Plaintiffs　　§
　　　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　§
vs.　　　　　　　　　　　　　　§　　Civil Action No. 6:13-cv-00054
　　　　　　　　　　　　　　　　§
　　　　　　　　　　　　　　　　§
Warrior Energy Services Corp.　　§
　　　　　　　　　　Defendant　　§

DECLARATION OF MIKE WARE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.　　"My name is Mike Ware. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.　　Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.　　Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.　　I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.

EXHIBIT "54"

During the relevant time period, I drove the Ford F-250 transporting property in interstate commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as

part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.   The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___8/29/2014___.
                                        Date

                                        Michael Ware
                                        _____
                                        Print Name

                                        _____
                                        Signature

4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| Donnie Eugene Aikins, et al. | § | |
| Plaintiffs | § | § |
| | | § |
| vs. | § | |
| | § | Civil Action No. 6:13-cv-00054 |
| | § | |
| Warrior Energy Services Corp. | § | |
| Defendant | § | |

DECLARATION OF JASON WATKINS

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Jason Watkins. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit.



EXHIBIT "55"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ___08/28/2014___.
                                              Date


                                    Jason watkins
                                    _____
                                    Print Name

                                    Jason Watkins
                                    _____
                                    Signature

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al.          §
                            Plaintiffs   §
                                             §
vs.                                      §
                                         §    Civil Action No. 6:13-cv-00054
                                         §
Warrior Energy Services Corp.            §
                            Defendant    §


DECLARATION OF KIRN WAYNE

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.       "My name is Kirn Wayne. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.


2.       Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.       Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.       I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "56"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

2

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ~~08/29/2014~~ .
                                                                        Date

~~Kirn wayne~~
Print Name

Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | § | § | |
| | | § | |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF AARON WILLARD

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1.     "My name is Aaron Willard. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2.     Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3.     Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and other states. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4.     I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "57"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or other states. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or other states performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or other states, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service

jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and other states transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

3

5.      During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6.      Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7.      The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on ~~09/03/2014~~.
                                        Date

~~Aaron Willard~~
Print Name

Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | | |
|---|---|---|---|
| Donnie Eugene Aikins, et al. | § | | |
| Plaintiffs | | § | |
| | | | § |
| vs. | § | | |
| | § | Civil Action No. 6:13-cv-00054 | |
| | § | | |
| Warrior Energy Services Corp. | § | | |
| Defendant | § | | |

DECLARATION OF JONATHAN WIRGES

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Jonathan Wirges. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate

EXHIBIT "58"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations.  The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

Signed under penalty of perjury on <u>08/28/2014</u>.
                                                            Date


                                        Jonathan Wirges
                                        _____
                                        Print Name


                                        _____
                                        Signature

4

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

Donnie Eugene Aikins, et al.           §
                              Plaintiffs        §
                                                    §
vs.                                            §
                                               §    Civil Action No. 6:13-cv-00054
                                               §
Warrior Energy Services Corp.          §
                              Defendant      §


DECLARATION OF SCOTT WITZIG

Pursuant to 28 U.S.C. § 1746, the undersigned declares as follows:

1. "My name is Scott Witzig. I am over the age of twenty-one (21) and am fully qualified to make this Declaration and the facts contained herein are true and based on my personal knowledge.

2. Defendant is in the well service business. I was employed by Defendant primarily as well service worker during all times relevant to this lawsuit. My primary job duties were to service wells for Defendant's in-state and out-of-state clients during the time period relevant to this lawsuit.

3. Throughout my entire employment with Defendant and as part of my required job duties, I worked with, worked on, drove and loaded pickup trucks, including but not limited to, the Ford Model F-250 pickup trucks frequently and on a weekly basis in conjunction with servicing wells for Defendant's in-state and out-of-state clients in interstate commerce and on public highways for Defendant's business-related purposes including servicing wells in North Dakota and for Defendant's out of state customers. The pickup trucks, including the Ford F-250 that I worked with, worked on, drove and loaded in interstate commerce for Defendant's business-related purposes have gross vehicle weight ratings of 10,000 pounds or less. The gross vehicle weight ratings of the Ford F-250 pickup trucks can be determined by examining the manufacturer's label on the inside of the driver's side door. I also drove vehicles with gross vehicle ratings of more than 10,000 pounds.

4. I worked with, worked on, drove or loaded the above described pickup trucks during every week of my scheduled shifts in interstate or foreign commerce carrying Defendant's property on public highways and as part of my required job duties without any trailer attached to or towed by the Ford F-250 during the time period relevant to this lawsuit. During the relevant time period, I drove the Ford F-250 transporting property in interstate



EXHIBIT "59"

commerce for Defendant's business-related reasons just as much as I drove commercial motor vehicles with gross vehicle weight ratings of more than 10,000 pounds. I drove the pickup trucks or Ford F-250 during most, if not all, well service jobs in interstate and foreign commerce carrying Defendant's property on public highways as part my required job duties whether servicing wells in North Dakota or for Defendant's out of state customers. It was common practice for me and all the crew members to drive the pickups or Ford F-250 for Defendant's business-related purposes in interstate commerce on public highways during a well service job whether in North Dakota or for Defendant's out of state customers performing such tasks as transporting Defendant's property, well servicing equipment and (fuel purchases) in the slip tanks contained in the bed of the pickups or Ford F-250 for business-related purposes so the equipment and machines could receive a steady flow of fuel on location during a well service job for Defendant's in-state and out-of-state customers. The slip tanks transported and contained in the bed of the Ford F-250 pickups did not alter, change or modify the gross vehicle weight rating of the Ford F-250. Additionally, I very rarely, if ever, pulled or towed a trailer or fuel trailer behind the F-250 when retrieving and loading fuel during a well service job on the public highways. Any trailer was towed on the public highways by the supervisor at the beginning and ending of a well service job and generally remained on location during the well service job until the job was completed whether the well service job lasted 2 days, 7 days or more than a week. When the fuel trailer arrived at the well site, it stayed on location and the overwhelming means of retrieving and loading fuel for use at the well site was in the portable slip tanks transported and contained in the bed of the Ford F-250. I would make numerous trips during the day and during a well service job on the public highways in interstate commerce retrieving and loading fuel at gas and fueling stations to supply the fuel trailer and the well service equipment for Defendant's well service jobs. There was a constant and continuing need and a part of my job duties to supply the fuel trailer and well service equipment by retrieving fuel from gas and fueling stations by driving the Ford F-250 (without any trailer attached) on the public highways. During well service jobs whether in North Dakota or for Defendant's out of state customers, I would routinely drive the pickups or the Ford F-250 to a fueling station. I would then load the fuel in the slip tanks. While loading the fuel in the slip tanks, I had the responsibility and would exercise judgment and discretion to ensure the proper placing and loading of Defendant's pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Additionally, I would exercise judgment and discretion to make sure the slip tank was properly affixed and secured to the pickups or Ford F-250 so that said vehicles could be safely operated on the public highways in interstate commerce. Furthermore, I would load tools, equipment, parts and supplies (including but not limited to foaming agents, friction reducer, oils, fluids and lubricants originating from out-of-state and used for, and purchased by, Defendant's clients and customers) in the bed of the Ford F-250 and would exercise judgment and discretion to make sure Defendant's property was properly placed, loaded and secured so that the vehicles could be safely operated in interstate commerce. The fuel, supplies and equipment I loaded and transported moved in interstate commerce and were in the continuous stream of interstate commerce and traveled across state lines. All of the loading described above was a continuing part of my job duties. I believe the loading, transporting of this fuel, equipment and supplies and fueling of the slip tanks in the

2

pickups was meaningful work because it kept the equipment and machines operating during well service jobs. Because, once me and the crew "rigged-up" the equipment and machines at a well site, the equipment generally stayed on location until the job was completed. The pickup trucks or Ford F-250 I transported as part of the equipment needed for our job and duties and used by me and the crew at well service jobs (without a trailer) were thus integral and necessary for the work required to service wells for Defendant's in-state and out-of-state customers. A well service job could not be successfully and effectively completed or performed without transporting and using the Ford F-250 as one of the most important pieces of equipment at the well site and its necessary use before, during and after a well service job for the day. If the Ford F-250 specially equipped with the slip tank was not driven to the well site by me and the other crew members daily, the well service job could not be done. The Ford F-250 was used as our mobile storage unit for our water, bags, supplies, tools and equipment needed on location at a well service job. The Ford F-250 contained the slip tank which was absolutely necessary for use in keeping the fuel trailer and equipment replenished and operating during a well service job. The Ford F-250 was used by myself and the crew numerous times per day to retrieve and load fuel for the well site. The Ford F-250 was not solely used for transporting the crew. Additionally, prior to beginning and after well service jobs for the day, I also routinely and regularly drove, or performed the duties of a driver of the pickup trucks or Ford F-250 containing the crew, tools, supplies and equipment to and from locations as directed by my supervisor after meeting at a designated location at the well site as required by my supervisor, a designated location such as the hotel or "man camp" parking area as required by my supervisor or Defendant's shop or "yard". Meeting at these designated locations and loading tools and equipment and also performing the duties of a driver of the pickup trucks or Ford F-250 were mandatory requirements as directed by my supervisor or Defendant. When directed by my supervisor to drive the Ford F-250 and the crew from the well site, I was not relieved of my work/driving duties until we returned to the man camp or hotel. I would also drive the pickups or Ford F-250 to a fueling station so the crew could load the slip tanks with fuel prior to arriving at the well site as required and directed by my supervisor. While performing these duties as a driver for the benefit of Defendant such as driving the crewmembers, and transporting the Ford F-250 for Defendant's business-related purposes, I and the other members of the crew are receiving instructions from the supervisor related to the well service job and we routinely performed a job safety analysis (JSA) during this time. I routinely on a weekly basis, and as part of my continuing job duties throughout my employment with Defendant as describe above, drove (without an attached trailer) and loaded the Ford F-250 and pickup trucks for trips to and from well sites, and for trips to, from and between North Dakota and for Defendant's out of state customers transporting property in interstate commerce on public highways for Defendant's business-related purposes. Also as a continuing part of my job duties, I would routinely drive the F-250 to pick up parts, supplies or equipment needed for, or at, well service jobs or the shop for Defendant's business-related purposes without a trailer attached from businesses. As part of my job duties during the relevant time period, I had a reasonable expectation that I would drive, load and work with Defendant's Ford F-250 pickups and other vehicles with gross vehicle weight ratings of 10,000 pounds or less engaged or used in interstate commerce on the public highways on a weekly basis. In

3

addition, I was in the position to be called upon at any time to drive or operate Defendant's Ford F-250 pickups in interstate commerce on the public highways and this driving was a continuing and required part of my job duties. I believe I could be terminated if I refused an assignment to drive or load Defendant's Ford F-250 pickups for business-related reasons in interstate commerce including but not limited to driving the F-250, the crew, supplies and equipment to and from the man camps/hotels to the well site locations. The required driving to and from the man camps/hotels to well site locations generally occurred almost exclusively without an attached trailer and I performed said driving on a weekly basis as a part of my required job duties.

5. During my scheduled shifts throughout my employment with Defendant, I routinely worked more than forty (40) hours in a workweek averaging approximately eighty (80) to one hundred (100) hours per workweek. Defendant did not pay me any overtime wages for the hours I worked in excess of forty (40) in a workweek during the time period relevant to this lawsuit.

6. Defendant is a federal motor carrier. Defendant's United States Department of Transportation Number is 442564.

7. The Defendant did not keep or require me to keep specific records related to the work I performed using the pickups or Ford F-250 or any vehicle with a gross vehicle weight rating of 10,000 pounds or less. Additionally, Defendant did not specifically document as matter of business practice each and every occasion or instance I performed work with a vehicle with a gross vehicle weight rating of 10,000 pounds or less during my employment relevant to this lawsuit.

      I have read this declaration. Under penalty of perjury, I declare that all of the foregoing statements made in this declaration are true and correct."

      Signed under penalty of perjury on   09/02/2014  .
                                        Date

                                        Scott W. Witzig
                                        Print Name

                                        Scott W. Witzig
                                        Signature

4